894 So.2d 178 (2004)
Jeffrey Lee WEAVER, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. SC00-247.
Supreme Court of Florida.
December 16, 2004.
*183 Richard L. Rosenbaum, Fort Lauderdale, for Appellant/Cross-Appellee.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Leslie T. Campbell and Debra Rescigno, Assistant Attorneys General, West Palm Beach, FL, for Appellee/Cross-Appellant.
PER CURIAM.
Jeffrey Lee Weaver appeals his conviction of first-degree murder of a law enforcement officer and a sentence of death. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. In sentencing Weaver to death, the trial judge overrode the jury's recommendation of life imprisonment. See § 921.141(3), Fla. Stat. (2003) (authorizing judicial overrides). For the reasons expressed below, we affirm Weaver's conviction but reverse the trial judge's override of the jury's recommendation of a life sentence and remand with instructions to enter a life sentence without the possibility of parole.[1]

*184 I. FACTS
On the evening of January 5, 1996, Jeffrey Weaver attempted the armed burglary of a car. When the attempt failed, he headed south. The victim contacted authorities and a BOLO ("be on lookout") was issued. Shortly thereafter, someone spotted Weaver lurking in the bushes and shoving what appeared to be a gun down his pants. About two hours after the attempted burglary, Officers Bryant Peney and Ray Myers saw Weaver near a local vocational school. Officer Peney saw that Weaver was acting suspiciously, activated his patrol car's lights, and stopped Weaver. Weaver ran. The officers chased him across a highway. When Weaver reached the other side of the road, and as Officer Peney approached the median, Weaver turned around, crouched in a shooting position and shot Officer Peney in the chest. Officer Peney fell to the ground. Weaver then aimed at Officer Myers, who was approaching. Officer Myers fired one shot, but missed Weaver. Weaver continued to run and eluded capture by making his way into a lake, where he spent the night in hiding.
When the paramedics placed Officer Peney on a gurney, a bullet fell to the ground. The bullet underwent testing and proved to be a .357 bullet containing Officer Peney's blood and DNA. At the hospital, doctors discovered that Officer Peney had suffered a single gunshot wound that went through his right arm, into his chest, and through his lungs, resulting in a perforated aorta and torn vena cava. The operating physicians noted that this combination of wounds was uniformly fatal. Officer Peney died the next morning while undergoing surgery for his wounds. That same morning authorities found Weaver near some bushes close to the lake.
Weaver was indicted for first-degree murder of a law enforcement officer (Officer Peney), aggravated assault (Officer Myers), armed resisting of an officer with violence (Officer Myers), carrying a concealed weapon, and attempted burglary of an occupied conveyance. Before trial, the attempted armed burglary charge was severed.
Officer Myers and various eyewitnesses testified at trial. Weaver told detectives that he was the person who shot Officer Peney. He performed a walk-through of the crime scene, where he reenacted how he shot Officer Peney. At trial, Weaver testified that he did not intend to shoot Officer Peney and that he fired at the officer in order to stop the foot chase and force Officer Peney to chase him in the patrol car.
Weaver was convicted of all charges. As to the murder conviction, by a vote of eight to four the jury recommended that Weaver receive a sentence of life imprisonment. The court held a Spencer hearing,[2] denied Weaver's motion for a new trial, and sentenced him to death. The court found four aggravating factors: (1) contemporaneous violent felony convictions involving Officer Myers; (2) that the victim was a law enforcement officer engaged in his official duties; (3) avoiding lawful arrest; and (4) disrupting or hindering a law enforcement officer. Aggravators two through four were merged into one. The court found one statutory mitigator, "no significant history of prior criminal activity" *185 little weight) and three nonstatutory mitigators, which included good employment record (moderate weight), cooperation with police (moderate weight), and adaptation to a life of incarceration/future value to society (little weight).[3] This appeal and cross-appeal followed.

II. DISCUSSION OF LAW
Weaver raises many issues on appeal. We discuss only the following: (1) whether discharge of appellant's second counsel was a proper exercise of discretion; (2) whether the trial court conducted proper Faretta[4] and Nelson[5] inquiries; (3) whether the trial court abused its discretion in requiring appellant to wear a stun belt; (4) whether the trial judge's decision to override the jury's eight to four life recommendation was proper; and (5) sufficiency of the evidence.[6]

A. Discharge of Appellant's Second Court-appointed Counsel
Weaver's first appointed counsel was dismissed on conflict grounds and Hillard Moldof was appointed. During the course of Mr. Moldof's tenure as court-appointed counsel, the trial court granted ten continuances totaling about two years. Mr. Moldof's busy trial calendar threatened to delay the case even further due to a pending retrial in another case (referred to in the record as the Penalver case). Finally, over Weaver's objection the court removed Mr. Moldof and appointed Edward Salantrie. Weaver appeals that decision.
The crime occurred on January 5, 1996. Mr. Moldof was appointed as a Special Public Defender on February 27, after Weaver's first counsel withdrew on conflict grounds. At a March 5 hearing, Mr. Moldof advised the court that the State had listed about 120 witnesses and that because this was a death penalty case he planned to depose virtually every single witness on the list. He notified the court that he would not be ready for trial in April. Thereafter, the court granted continuances at status conferences held on April 25, September 25, December 6, and February 13, 1997.
At a status conference on March 26, 1997, the State requested a firm trial date, but Mr. Moldof responded that the State was going to present DNA evidence that could prove crucial. Defense counsel also noted that he was the only lawyer handling the case and he already had conducted about 100 depositions; he had taken as many as 20 depositions in one day. He *186 argued that his inability to go to trial was a function of the State's lengthy witness list, which had approximately 200 potential witnesses, and the complexity of the case.
On May 1, 1997, the court granted another continuance. Defense counsel mentioned the pending trial in Penalver and estimated that it would take five to six weeks. The court did not set a firm trial date for July because it had not heard any pretrial motions and depositions were still ongoing.
On July 10, defense counsel, who was in the middle of trial in another case, received another continuance and the court set a September trial date.
On September 19, defense counsel noted that the Penalver trial was in its sixth month. He told the court that he would not be ready for Weaver's trial. The court allowed another continuance.
On November 20, Mr. Moldof informed the court that he was still in trial, but he hoped that the jury deliberations would begin December 15. The court granted another continuance. The trial judge informed the parties that she was leaving the criminal division and would not try the case and that another trial judge would take over the case.
On December 23, 1997, at a status conference before the new trial judge, defense counsel informed the court that he still needed to conduct 140 depositions. The court continued the case and set a loose trial date for the end of March. The following exchange took place:
THE COURT: [Mr. Moldof], I'm convinced that the delay in this case for two years has nothing to do with your, you know, being lackadaisical or not paying attention to this case. You have been involved in another case.
MR. MOLDOF: That's all I'm saying . . .
MR. SATZ: Listen, Your Honor, I just want to put this on the record and be clear. Just because Mr. Moldof cannot control this case, if he  when he accepted the appointment in this case or any, you know, during the portion thereof if he felt that he couldn't handle it with all the other cases, he should have gotten off. I'm not just going to sit here and let the State's case dissipate because it's not convenient.
The court asked Mr. Moldof if he wanted to stay on the case and he responded:
MR. MOLDOF: Judge, I'm going to do whatever Mr. Weaver wants and I've talked to him and he's comfortable with me representing him. All I'm saying is that this  the trial [in Penalver] was unanticipated. That's the only problem that it raised.
THE COURT: Right.
. . . .
THE COURT: Okay. All right. Then let me pick out a date in March. But, you know, I can sympathize with the plight of the Peney family. But, on the other hand, if we were to just satisfy them and rush to trial . . . we all know what the consequences are. If I hold his feet to the fire and force him to go to trial when he's not ready, if he's convicted it will be right back in my lap or someone else's lap.
The court then mentioned to Mr. Moldof that after Penalver a host of other judges wanted him to start trying cases that he had pending before them. Defense counsel did not dispute this assertion. The court predicted that this situation presented the possibility that Weaver's case would not get to trial until December 1998. The court set a status conference for March 19, 1998.
On February 6, 1998, defense counsel filed a "Motion for Special Status and Determination *187 of Continuous Circumstances." A hearing was held on February 16, where defense counsel informed the court that the nine-month trial in Penalver had ended in a mistrial. The retrial in Penalver was scheduled for April 1998 and defense counsel voiced the prospect that the retrial would take another eight months, thus delaying his preparation in Weaver's case. Mr. Moldof expressed that if he were relegated to the role of penalty phase counsel, he would resign. The prosecutor acknowledged that defense counsel had conducted 111 depositions. The court noted that a lot of work still needed to be done. Mr. Moldof suggested the appointment of another attorney to assist him in discovery matters, but the State noted that the contract of representation prohibited a lawyer from "farming out some work to other lawyers" so that "the attorney himself presents his case and no one else's." At best, the contract allowed for the appointment of separate penalty phase counsel, but only one attorney could handle the guilt phase.
The court noted that Weaver was an indigent defendant and did not have a right to choose particular court-appointed counsel and all he could demand was effective representation. It stated that both sides were entitled to a fair trial. The court decided that it would contemplate the issue and make a decision at a later hearing. On February, 23, 1998, the court decided to remove Mr. Moldof. Weaver objected.
The issue in this case is whether the court's removal of Mr. Moldof was appropriate given that Weaver did not seek discharge of counsel; Weaver objected to the removal; the State did not file a motion to remove defense counsel; defense counsel did not file a motion to withdraw; and there was no conflict of interest. This Court has never addressed removal of counsel under these circumstances.[7]
A court's decision involving withdrawal or discharge of counsel is subject to review for abuse of discretion. See Weems v. State, 645 So.2d 1098, 1099 (Fla. 4th DCA 1994) (stating that denial of appointed counsel's motion to withdraw will not be disturbed absent clear abuse of discretion); Sanborn v. State, 474 So.2d 309, 314 (Fla. 3d DCA 1985) (same); Anderson v. State, 439 So.2d 961, 962 (Fla. 4th DCA 1983) (same). A trial court's discretion to discharge counsel without a request from either counsel or from either party is, however, narrower than the court's "broad discretion to determine whether a motion to withdraw should be granted." Sanborn, 474 So.2d at 314. Therefore, we review the judge's decision in this case to determine if the judge abused this narrower scope of discretion.
The general rule is that an indigent defendant has no right to choose a particular court-appointed attorney. See Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); Capehart v. State, 583 So.2d 1009, 1014 (Fla.1991) (citing Hardwick v. State, 521 So.2d 1071, 1074 (Fla.1988)); Harold v. State, 450 So.2d 910, 913 (Fla. 5th DCA 1984) ("An indigent *188 defendant does not have the right to pick and choose the lawyer who will represent him."). Thus, if a trial court decides that court-appointed counsel is providing adequate representation, the court does not violate an indigent defendant's Sixth Amendment rights if it requires him to keep the original court-appointed lawyer or represent himself. Foster v. State, 704 So.2d 169, 172 (Fla. 4th DCA 1997).
While this is the general rule, other courts have held that a trial court abused its discretion or exceeded its authority in removing a defendant's court-appointed counsel and appointing other counsel over the defendant's objection.[8] Many of these cases acknowledge that an indigent defendant is not entitled to choose a particular court-appointed attorney, but reason that once counsel is appointed, an attorney-client relationship is established and "is no less inviolable than if counsel had been retained by the defendant himself." McKinnon v. State, 526 P.2d 18, 24 (Alaska 1974) (holding that the trial court abused its discretion in replacing the public defender because of the trial judge's impatience with the public defender's alleged inadequate preparation and inability to proceed on the date of the scheduled court appearances); see also Stearnes v. Clinton, 780 S.W.2d 216, 223 (Tex.Crim.App.1989) (stating that the power of the trial court to appoint counsel to an indigent defendant does not carry with it the concomitant power to remove counsel at his whim).
These cases reject the argument that because a defendant does not pay his fee, he has no ground to complain about his counsel's removal by the court as long as the replacement attorney handles the case competently. See Smith, 440 P.2d at 74; cf. Finkelstein v. State, 574 So.2d 1164, 1168 (Fla. 4th DCA 1991) (noting that "[o]nce counsel has been chosen, whether by the court or the accused, the accused is entitled to the assistance of that counsel at trial") (quoting Harling, 387 A.2d at 1105). They reason that the attorney-client relationship is independent of *189 the source of compensation because an attorney's responsibility is to the person he represents rather than the individual or entity paying for his services. See Smith, 440 P.2d at 74. We agree. To allow trial courts to remove an indigent defendant's court-appointed counsel with greater ease than a non-indigent defendant's retained counsel would stratify attorney-client relationships based on defendants' economic backgrounds.
The right to chosen counsel, however, is not absolute. A trial judge may, in the interest of justice, substitute one counsel for another. Finkelstein, 574 So.2d at 1168. A court would be serving such an interest if it sua sponte removed counsel who was grossly incompetent, physically incapacitated, or conducting himself in an inappropriate manner that could not "be cured by contempt proceedings." Id.
Where the issue is not defense counsel's conduct but unexpected difficulties in his trial calendar that threaten the State's right to a fair trial, trial judges may also exercise their discretion and remove counsel over defendant's objection. Cf. United States v. Koblitz, 803 F.2d 1523, 1528 (11th Cir.1986) (suggesting that if counsel's busy trial calendar causes delay, then the State's interest in the efficient administration of justice allows a trial court to require a defendant to substitute other counsel). In announcing this rule, we emphasize the unique facts of this case. Trial judges should invoke this discretion with great circumspection and only in extraordinary circumstances.
This case does present such circumstances. The court was concerned that the State's case could become weaker and harder to try with the increasing passage of time. During the February 19, 1998, hearing, Judge Speiser told the parties:
THE COURT: My inclination would have to be to take Mr. Moldof off the case in view of what is expressed here today [i.e., the pending retrial in Penalver]. This is done for purposes of the, in the Court's view, of maintaining justice in this case, and to insure this case does reach a trial date that is within some realm of reasonableness from the date this crime allegedly occurred.
Mr. Moldof is placed in a situation that he's now in that is beyond his control as a result of other individuals' actions who have made, in effect, the decision for him.
The court's decision to remove Mr. Moldof was based on the fact that the lengthy retrial in Penalver prevented him from dedicating the amount of time necessary to Weaver's case.
The court's decision is supported by Koblitz, 803 F.2d at 1528, which suggests that continuous delays due to counsel's busy trial calendar can justify a trial court's decision to require a defendant to obtain substitute counsel. In Koblitz, the court held that the trial court violated defendant's Sixth Amendment right to choose his counsel when it instructed defendant's retained counsel, instead of the defendant, to find substitute counsel. Id. However, the court did note that the government's interest in the efficient administration of justice could require a defendant to resort to his second choice of counsel where the trial judge had granted several continuances and the original counsel continued to tell the court that he would not be ready for trial.[9]
*190 Weaver argues that a defendant has a right to have his lawyer, with whom he develops a relationship, follow the case through to conclusion. Whatever interest an indigent defendant has in maintaining and keeping the attorney-client relationship with his court-appointed counsel, however, exists alongside the State's own interest in the efficient administration of justice. Cf. Martinez v. Court of Appeal of California, 528 U.S. 152, 162, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) (explaining that "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"); Allen v. Butterworth, 756 So.2d 52, 65 (Fla.2000) (noting the State's legitimate interest in the prompt and efficient administration of justice in capital cases and the capital defendant's legitimate interest in the fairness of capital postconviction process). "Article I, section 2 of the Florida Constitution provides that justice shall be administered without denial or delay" and "[t]he State, as prosecutor, has the same right to justice without delay as any other party." State v. Antonucci, 590 So.2d 998, 1000 (Fla. 5th DCA 1991) (granting writ of certiorari and quashing trial court's sua sponte order continuing criminal case for one year or until conclusion of related civil case where the State's key witnesses were so elderly that delay would likely prejudice the State).
Here, the State argued that almost two years had passed since the commission of the crime and that continuing the case further would undermine its case. The State could no longer locate several witnesses, others had faded memories, and some witnesses with direct knowledge of the case had yet to be deposed. At the time of Mr. Moldof's removal, the court had continued the case for approximately two years.
It is important to note that the court's decision to remove Mr. Moldof was not done out of any animus towards the defense. In fact, the court, in granting the various continuances, acknowledged the complexity and size of the case. The court made its final decision when it was faced with the retrial in Penalver, which threatened to delay Weaver's case by another nine months. This would have meant that the trial would have occurred three years after the crime. We hold that the trial court did not abuse its discretion in discharging counsel under the unique circumstances of this case.

B. Sufficiency of the Trial Court's Nelson and Faretta Inquiries
Weaver next argues that he never unequivocally requested that the court discharge his counsel and allow him to represent himself, and thus the court abused its discretion in discharging his counsel. We reject this argument.
Shortly before trial, Weaver filed a motion to discharge Mr. Salantrie, the attorney whom the court appointed after it removed Mr. Moldof, over a disagreement about defense strategy. The court held a Nelson hearing,[10] where it found that Mr. Salantrie was rendering competent assistance of counsel. Thereafter, the court conducted a Faretta inquiry[11] and allowed *191 Weaver to discharge his counsel. Weaver proceeded pro se in the guilt phase, but retained his appointed penalty-phase counsel, Raag Singhal.
When a defendant seeks to discharge his court-appointed counsel, the trial judge should inquire of the defendant as to the reason for the request. See Nelson v. State, 274 So.2d 256, 258-59 (Fla. 4th DCA 1973). If the defendant cites incompetency of counsel, the trial judge should determine whether there is reasonable cause to believe that the court-appointed counsel is rendering ineffective assistance. Id. If reasonable cause exists, the court should make such a finding on the record and appoint a substitute attorney, who should be allowed adequate time to prepare the defense. Id. If no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record and advise the defendant that if he discharges his original counsel, the court may not thereafter be required to appoint a substitute. Id. If the defendant continues to demand dismissal of his court-appointed counsel, the trial judge may in his discretion discharge counsel and require the defendant to proceed to trial without representation. Id.
Weaver filed a pro se"Motion for the Removal of, Replacement of My Appointed Counsel Edward G. Salantrie." The motion asserted that Mr. Salantrie would not present the defense Weaver sought. Shortly thereafter, Mr. Salantrie filed a "Motion to Withdraw" asserting that he and Weaver "had a serious disagreement regarding the hiring of various experts and what defense should be pursued." Mr. Salantrie's motion also stated that he had "performed extensive work and hired experts to pursue and develop evidentiary support for the defense coveted by the defendant," but that he had "developed no credible evidentiary support for the defendant's contentions."
The court held a hearing on the motions. At the outset, Mr. Salantrie withdrew his motion to withdraw, which meant that the only pending motion was Weaver's motion to discharge. Thus, discharge of Mr. Salantrie was ultimately the result of Weaver's decision to proceed on his motion to discharge. Weaver explained he and Mr. Salantrie could not agree on the particular defense that should be presented to the jury. Weaver wanted to argue that his bullet could not have hit Officer Peney, while Mr. Salantrie wanted to argue that Weaver's bullet struck Officer Peney unintentionally. In essence, Mr. Salantrie's defense theory was that Weaver did not intend to shoot Peney and, therefore, he was only guilty of second-degree murder.
The court found "beyond any doubt" that Mr. Salantrie had spent many hours trying to prepare Weaver's defense and found counsel's performance in the case "impeccable and certainly quite impressive and effective." It concluded that Mr. Salantrie was rendering effective assistance of counsel and that his proffered defense was consistent with the evidence. Thus, Weaver was not entitled to substitute counsel if he discharged Mr. Salantrie.
After finding that Mr. Salantrie was rendering effective assistance, the court asked whether Weaver wanted to keep Mr. Salantrie or discharge him. The court stated:
Because if you do not want Mr. Salantrie to represent you, this Court would *192 not be in a position to appoint you another attorney. . . . If you can afford an attorney of your own, you have that right to retain private counsel. And if you decide not to have Mr. Salantrie represent you, then you will need to determine whether or not you are competent yourself to represent yourself in this matter.
Weaver reiterated that he could not proceed with Mr. Salantrie's defense and did not want his assistance if it meant proceeding with the second-degree murder defense. The Nelson hearing adequately safeguarded Weaver's rights.
After deciding that Weaver could not afford a private attorney, the court explained it would be conducting a Faretta inquiry to determine whether Weaver was knowingly and intelligently waiving his right to court-appointed counsel. In Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court held that a defendant has an affirmative right to present his own defense. A trial court may not impose counsel on a "literate, competent, and understanding" defendant who has voluntarily waived his right to counsel. Id. at 835, 95 S.Ct. 2525. This requirement is reflected in Florida Rule of Criminal Procedure 3.111(d)(3), which provides:
Regardless of the defendant's legal skills or the complexity of the case, the court shall not deny a defendant's unequivocal request to represent himself or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel.
The court followed the model colloquy in rule 3.111. It advised Weaver that by giving up his right to counsel he was relinquishing the benefit of having an attorney to (1) uncover potential constitutional violations; (2) ensure compliance with speedy trial and statute of limitations provisions; (3) uncover favorable evidence that could be introduced at trial; (4) effectively argue a legal defense on his behalf; (5) assist during jury selection and jury instructions; (6) call witnesses on his behalf, cross-examine the State's witnesses, and make closing arguments; and (7) properly preserve errors for appellate review. The court warned Weaver that it is "almost always unwise to represent yourself in court"; that self-representation would not entitle him to any special treatment such as extended library privileges; that the State would not treat him any differently because of his pro se status; that he was not entitled automatically to a continuance even though he was deciding to proceed pro se a week before the trial; that while he was not required to have the legal knowledge or skills of an attorney, he was expected to abide by the rules of criminal law and procedure; that the trial could continue without him if he became disruptive; that his access to the State Attorney would be severely reduced in comparison to court-appointed counsel; and that if he was convicted, on appeal he would not be able to claim ineffective assistance of counsel on the grounds that he lacked legal knowledge or skill.
The court confirmed that Weaver had received and read the indictment and that he understood the charges against him. The court advised him that the armed burglary count had been severed. The court also explained the possible penalties that he was facing under the indictment. Before discharging Mr. Salantrie, the court asked whether Weaver wished to speak with counsel in private. Weaver accepted and the court granted a fifteen-minute recess. Weaver stood firm on his decision to proceed without Mr. Salantrie.
Finally, the court determined that Weaver's waiver of court-appointed counsel *193 was knowing and intelligent. It confirmed that Weaver read and wrote English, was not under the influence of drugs or alcohol, had never been diagnosed or treated for mental illness, did not have a physical impairment, and had not been compelled to forego counsel. The court found that Weaver was familiar with his case and its facts as evidenced by his detailed notes and his familiarity with the testimony of various witnesses.
Weaver argues, however, that the court should not have undertaken a Faretta inquiry because he never made an unequivocal request to represent himself. We disagree. Weaver decided to discharge Mr. Salantrie even though the court found that he was providing effective and competent counsel. A defendant who persists in discharging competent counsel after being informed that he is not entitled to substitute counsel is presumed to be unequivocally exercising his right of self-representation. See Hardwick v. State, 521 So.2d 1071, 1074 (Fla.1988); Jones v. State, 449 So.2d 253, 258 (Fla.1984).
Finally, Weaver claims that he was not competent to represent himself. The focus of a Faretta hearing under rule 3.111 is whether a defendant is competent to waive the right to counsel, not whether he is competent to provide an adequate defense. See State v. Bowen, 698 So.2d 248, 251 (Fla.1997). "[A] defendant does not need to possess the technical legal knowledge of an attorney before being permitted to proceed pro se." Hill v. State, 688 So.2d 901, 905 (Fla.1996). During the Faretta inquiry, the court determined that Weaver was competent to waive his right to counsel.
We conclude that the Nelson and Faretta inquiries conducted by the trial court adequately safeguarded the defendant's rights.

C. Trial Court's Decision to Allow Use of a Stun Belt
Weaver next argues that the trial court abused its discretion in allowing the State to fit him with a stun belt. The trial court determined that courtroom safety justified the use of a stun belt and required Weaver to wear one throughout the proceedings.
A trial court's decision to allow the use of a stun belt is governed by the same legal principles developed in our earlier cases regarding the use of physical restraints at trial, primarily the use of shackles. See, e.g., Bryant v. State, 785 So.2d 422, 428 (Fla.2001) (involving use of leg and waist restraints). As a general rule, a defendant has the right to appear before the jury free from physical restraints. See Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (mentioning this principle in relation to shackles). However, a criminal defendant's right to be free of physical restraints is not absolute. See Bryant, 785 So.2d at 428; United States v. Mayes, 158 F.3d 1215, 1225 (11th Cir.1998) (quoting United States v. Theriault, 531 F.2d 281, 284 (5th Cir.1976)). Restraints "may be necessary to prevent the defendant from disrupting the trial . . . and to protect the physical well-being of the jury, lawyers, judge, and other trial participants." Israel v. State, 837 So.2d 381, 390 (Fla.2002) (quoting Zygadlo v. Wainwright, 720 F.2d 1221, 1223 (11th Cir.1983)). The use of restraints is within the sound discretion of the trial court. See Elledge v. State, 408 So.2d 1021, 1023 (Fla.1981).
The trial court discussed the use of a stun belt during a hearing on various motions. A separate evidentiary hearing was not required. The court articulated on the record why the stun belt was necessary. While the hearing was somewhat informalfor example, the sheriff was not under *194 oath when he explained the operation and use of the belt  the court's inquiry was sufficient. The court addressed factual questions related to the stun belt's operation, explored less problematic methods of restraint, and found that the belt was necessary in this particular case for reasons articulated on the record.[12]
Specifically, a sheriff from the Broward Sheriff's Office informed the court of the belt's workings and concealability as well as the conditions that would require its activation. While there was no prior history of violent courtroom outbursts, the court noted that Weaver's self-representation would have him moving about the courtroom and this presented some safety concerns. The court pointed out that there would be sidebar conferences, access to witnesses and jurors, and the State expected to introduce guns and ammunition at the trial. When Weaver asked the court to consider other alternatives, the court replied that it could not have him wear leg irons or handcuffs in front of the jury and that leg braces would limit his mobility. The court determined that the stun belt was the best device to address the security concerns presented by appellant's pro se status. It found the stun belt neither visible nor suggestive and ordered that a jacket be made available to better conceal the belt.
Weaver's argument that the trial court erred in ordering the use of a stun belt is especially weak in light of his pro se status. While prior violent courtroom behavior can justify the imposition of restraints, it is not the only circumstance justifying their use. Cf. Bryant, 785 So.2d at 429 (holding that necessity of restraints was justified by trial judge's first-hand knowledge of defendant's prior violent courtroom behavior). Weaver's pro se status meant that he would be moving about the courtroom in close proximity to the judge, jurors, prosecutors, witnesses, and potential firearm evidence. This closer proximity to various trial participants arguably raises greater safety concerns than a defendant who is represented by counsel and has no legitimate reason to wander beyond the defense table. Given these circumstances, in which a defendant charged with first-degree murder was representing himself and moving about the courtroom in close proximity to trial participants, especially adverse witnesses, the trial court did not abuse its discretion even though Weaver had no prior history of violent courtroom behavior.
Weaver relies on the Eleventh Circuit's decision in United States v. Durham, 287 F.3d 1297 (11th Cir.2002). In Durham, 287 F.3d at 1305-06, the court noted that stun belts pose "a far more substantial risk of interfering with a defendant's Sixth Amendment right" to confer with counsel and direct his own defense than do leg shackles and that discharge of a stun belt poses a greater threat to the dignity of the courtroom than shackles. The court reasoned that although stun belts were less visible than other restraining devices, they also imposed a substantial burden on a defendant's ability to participate in his own defense because "[i]t is reasonable to assume that much of a defendant's focus and attention when wearing [a stun belt] is *195 occupied by anxiety over the possible triggering of the belt." In short, the defendant would be too busy concentrating on doing everything to prevent the belt's activation at the expense of his participation. Id. at 1306.
Certain facts distinguish Weaver's case from Durham. Durham did not act pro se and thus did not present the more pressing safety concerns inherent in the pro se context. Nevertheless, Weaver argues that Durham's rationale about the "substantial burden" that a stun belt imposes on a defendant's ability to participate in his own defense is not limited to defendants represented by counsel and applies with even more force to a pro se defendant. He argues that the "anxiety" caused by the possibility of an accidental discharge is arguably more present given that the pro se defendant is making more movements that could be perceived as threatening, thereby triggering an unwarranted discharge of the stun belt. See id. at 1305 (stating that the "fear of receiving a . . . shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial  including those movements necessary for effective communication with counsel").
The trial court was concerned with the unique security issues posed by Weaver's pro se status and not just with the possibility of disruptive trial antics. There is a meaningful distinction between mere verbal disruption and conduct that threatens courtroom security. See Hawkins v. Comparet-Cassani, 251 F.3d 1230, 1240 (9th Cir.2001). Potential threats of violence or escape are sufficiently identifiable to allow a defendant to advocate his cause without fear that law enforcement will mistake his forceful advocacy for such a threat. See id. As a result, concerns about a stun belt's potential to prejudice or "chill" a defendant's advocacy are less compelling when the belt's use is justified on grounds of preventing violence or escape. See id. at 1242 (discussing the prejudice concerns posed by shackles and alternative forms of restraint and noting that in shifting the focus from preventing disruption to addressing security, the belt's "chilling" effect becomes less prejudicial and the alternatives more so).
A stun belt's potential for prejudice must be measured against other alternative forms of restraint and whether these alternatives are less prejudicial or viable. In this case, there was virtually no alternative to a stun belt given the visibility of other restraints and the security concerns posed by Weaver's pro se status. As this Court has stated, a criminal defendant's right to be free of physical restraints is not absolute. Bryant, 785 So.2d at 428; see also Mayes, 158 F.3d at 1225. Under these circumstances, the decision to employ a stun belt constitutes a rational exercise of the trial court's discretion that was reasonably necessary to ensure order and safety in the courtroom, especially in light of defendant's pro se status.
Next, we must address the undisputed accidental discharge of the stun belt. During voir dire, the stun belt was accidentally discharged outside the presence of the jurors. The belt was activated after a guard accidentally triggered the remote control while helping to move a courtroom computer. The deputy was using an older model of the belt that did not have a protective guard on the remote control unit. When initially informed about the stun belt, the court was informed that the triggering mechanism involved a key rather than a switch. Thus, the belt that was being used differed from the one initially described. The record suggests that the older model was necessary because the *196 model initially described to the court did not adequately secure Weaver.
After the accidental discharge, the deputy removed the stun belt control from her belt and placed it in a drawer. The following exchange occurred between appellant and the judge:
THE COURT: All right. Mr. Weaver, are you okay?
THE DEFENDANT: Just shaken a little bit, that's all.
THE COURT: Are you ready? Are you able to proceed now?
THE DEFENDANT: Could we wait about 15 more minutes, just maybe get this little nervousness calmed down a little bit.
THE COURT: I overheard your lawyers ask you when you walked in, they asked you how you were. You said you were fine.
THE DEFENDANT: As far as pain or anything like that, there is no pain. But there is a little bit  you can see 
Shortly thereafter, a brief recess was taken. After the recess the court asked appellant if he was ready to proceed and he said, "I suppose." The jury was brought back into the courtroom and defendant proceeded with his voir dire of the jurors. Before the lunch break, the court informed Weaver that a nurse would examine him. The nurse determined that Mr. Weaver was fine.
Weaver now argues that "he became meek and subdued" after having been stunned by the electrical bolt and that he was no longer as zealous an advocate for himself. This issue was never raised at trial. Absent fundamental error, an issue will not be considered for the first time on appeal. Farinas v. State, 569 So.2d 425, 429 (Fla.1990). Weaver did not object and did not request a mistrial. Even now he fails to specifically allege how the shock affected his performance.
While no Florida court has considered the accidental discharge of a stun belt, other jurisdictions have held that a defendant is not prejudiced where the discharge occurs outside the presence of the jury. See Wachholtz, 952 P.2d at 398 (affirming denial of motion for mistrial based on the accidental discharge of stun belt that occurred while potential jurors were assembled but before voir dire had begun, where the defendant had offered no evidence that potential jurors actually heard the defendant scream after the belt's discharge); Hollaway v. State, 116 Nev. 732, 6 P.3d 987, 994 (2000) (reversing conviction, in part, because of stun belt's accidental discharge before the jury during closing arguments); State v. Filiaggi, 86 Ohio St.3d 230, 714 N.E.2d 867, 875 (1999) (finding that defendant's jury waiver was knowing, intelligent, and voluntary even though it occurred on the same day as accidental discharge of stun belt where court took a recess directly after accidental discharge for the remainder of the morning and reconvened in the afternoon).[13] In this case, the accidental discharge occurred outside the jury's presence and the trial court took a brief recess before continuing voir dire. Therefore, the accidental discharge of the stun belt did not prejudice the defendant.

D. Trial Judge's Override of the Jury's Life Recommendation
The jury recommended life imprisonment. The trial court overrode that recommendation and sentenced Weaver to *197 death. We reverse on this issue and remand for the imposition of a life sentence without the possibility of parole.
Long ago we stated the standard the trial court must use in determining whether to override a jury's recommendation of a life sentence. In Tedder v. State, 322 So.2d 908, 910 (Fla.1975), we held that "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." This inquiry and the built-in deference to the jury's recommendation "honors the underlying principle that this jury's advisory sentence reflect[s] the `conscience of the community' at the time of [the] trial." Keen v. State, 775 So.2d 263, 283 (Fla.2000). As we recently emphasized, "[t]he singular focus of a Tedder inquiry is whether there is `a reasonable basis in the record to support the jury's recommendation of life,' rather than the weighing process which a judge conducts after a death recommendation." Id. (quoting San Martin v. State, 717 So.2d 462, 471 (Fla.1998)); see also Cheshire v. State, 568 So.2d 908, 911 (Fla.1990) (reiterating that under Tedder, "the trial court's role is solely to determine whether the evidence in the record was sufficient to form a basis upon which reasonable jurors could rely in recommending life imprisonment"). We explained in Keen that "the jury's life recommendation changes the analytical dynamic and magnifies the ultimate effect of mitigation on the defendant's sentence." Id. at 285.
Before reviewing the trial court's override analysis, we must discuss the validity of the aggravating and mitigating circumstances found in this case. The trial court found four aggravating factors, which Weaver does not challenge: (1) contemporaneous violent felony convictions; (2) the victim was a law enforcement officer engaged in his official duties; (3) avoiding lawful arrest; and (4) disrupting or hindering a law enforcement officer. Aggravators two through four, however, were merged into one. The court found one statutory mitigator of "no significant history of prior criminal activity" (given little weight) and three nonstatutory mitigators: good employment record (moderate weight), cooperation with police (moderate weight), and adaptation to a life of incarceration/future value to society (little weight).
Despite Weaver's arguments, the court properly rejected the following mitigation as not established by the greater weight of the evidence: (1) contribution to society/charitable, humanitarian deeds;[14] (2) being a good parent;[15] (3) religious devotion;[16] (4) circumstances of the offense;[17] (5) potential for rehabilitation;[18] *198 (6) sorrow over the victim's injury and death;[19] (7) pretrial and trial conduct;[20] and (8) any other mitigating circumstance within the knowledge of the court. Competent, substantial evidence supports the trial court's rejection of these mitigating circumstances. See Campbell v. State, 571 So.2d 415, 420 (Fla.1990) (stating that whether a mitigating circumstance has been established by the evidence in a given case is a question of fact and subject to the competent substantial evidence standard). Similarly, the weight given to the mitigation does not constitute an abuse of discretion. The sentencing order articulates the court's rationale regarding the weight determinations for the statutory and nonstatutory mitigators. See id. (stating that the weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard).
Because the central focus of a Tedder inquiry is whether there is a reasonable basis in the record to support the jury's recommendation of life, we must examine what was presented during Weaver's penalty phase. At the penalty phase, the State called two witnesses: Officer Peney's mother and the former captain of the Ft. Lauderdale police department, Paul Urschalitz. Mr. Urschalitz testified about Officer Peney's effectiveness in carrying out the department's "community policing" initiative. The State also introduced evidence of prior criminal convictions in order to rebut the mitigating circumstance of lack of prior significant criminal history.
Weaver's penalty phase counsel called various witnesses. The mother of Weaver's son testified that Weaver helped her raise her other two children as if they were his own. She also testified that Weaver provided financially for them and that he cashed out his retirement plan so that he could pay off their debts. Weaver's mother testified about how Weaver respected his family and took care of his sister and her children when her abusive husband left them. Weaver's sisters also testified. Weaver's older sister testified about how Weaver assisted her when she had problems and how much he meant to her. Another sister testified about how he helped her after her husband kicked her out of the house and about Weaver's ability to help resolve family disputes even though he was in prison. Weaver's youngest sister testified about their "close bond" and how he still gives her "good advice" when he calls her from prison.
Mr. Decker, a former co-worker, testified that Weaver was a responsible, hard worker and characterized him as a generous, honest person who would send most of his paycheck to his family. Brian Putnam, Weaver's co-worker when he worked at a cotton mill, testified that Weaver was a *199 very smart and hardworking individual. He also testified about how Weaver cared for his girlfriend's two children as if they were his own. Mr. Mykitka, Weaver's former boss for six months, testified that Weaver was a good and diligent worker who was reliable.
William Lehman Eaton, a long-time friend of Weaver, testified about how Weaver convinced his father to take Eaton into his home after Eaton's stepmother kicked him out of the house. He also testified that Weaver was nonviolent and that "he was always helping everybody out" and about Weaver's involvement in a prayer group during high school.
Timothy Madison Denton, Weaver's friend from high school, also testified that Weaver was "very passionate" about religion and the Bible and how he headed a Bible study group in high school. Mr. Madison testified that the time he spent with Weaver had a very positive impact on him throughout his entire life. Betty Rabon Scott, another friend of Weaver's from high school, testified that he was an honest individual. Counsel introduced Weaver's high school diploma, which he earned while at the Broward County Jail. Finally, Weaver's counsel pointed out that the five convictions on Weaver's record were misdemeanor offenses, none of which involved violence.
As stated above, "[t]he singular focus of a Tedder inquiry is whether there is `a reasonable basis in the record to support the jury's recommendation of life,' rather than the weighing process which a judge conducts after a death recommendation." Keen, 775 So.2d at 283-84 (quoting San Martin, 717 So.2d at 471). The "reasonable basis" analysis must focus on finding support for the jury's recommendation and does not demand that the judge agree with the jury's conclusion. See id. at 283 (noting that "[r]easonable arguments [could] certainly be presented to support [the trial judge's] order" but overturning trial judge's decision to override jury's life recommendation).
The sentencing order does not follow a Tedder analysis. It does not focus on whether there was a reasonable basis to support the jury's life recommendation. Instead, it appears to engage in the "weighing process which a judge conducts after a death recommendation." Id. at 283. For example, the sentencing order states:
In summary, this Court has established, considered, and weighed the mitigating factors against the aggravating factors. Despite the existence of the four mitigating factors and the weight assigned to each by this Court, their nature and quality pale when compared to the severity and enormity of the circumstances of this case. Although no two cases are ever completely alike, this Court has reviewed the mitigating factors which the Supreme Court of Florida has unequivocally identified and determined to be significant and commonly present in cases where they have reversed a trial court's override of a jury's recommendation of a sentence of life incarceration. None are present in this case. The recommendation by the jury in this case of a life sentence was based on minor mitigating circumstances when compared to the outrageousness of the crimes committed. . . .
. . . .
. . . The weighing process within this case and the proportionality review with other cases require the imposition of the ultimate penalty. There is a reasonable basis to override the jury's recommendation.
(Citations omitted.)
While the sentencing order is thoughtful and well-written, the order's override analysis *200 appears to violate Tedder and its progeny to the extent that it engages in the weighing process that a judge conducts when he receives a death recommendation. The order essentially cites and discusses other judicial override cases and seeks to distinguish them on the basis of the aggravating and mitigating factors in those cases. The sentencing order's override analysis approximates a weighing analysis, which is not the standard that should be employed when contemplating a judicial override. See Keen, 775 So.2d at 283 (overturning a trial court's judicial override of a life recommendation based on the trial court's reasoning that "[t]he mitigating evidence is wholly insufficient to outweigh the aggravating circumstances in support of a life sentence").
As we recently emphasized, "a fundamental distinction exists between a defendant who receives an advisory sentence of death from a jury as opposed to one who receives an advisory sentence of life." Keen, 775 So.2d at 284 n. 19. In the latter context, it must be assumed that at least six members of the twelve-member jury concluded that based on the record before them, the mitigation evidence compelled a life recommendation. From that starting point, the mitigation evidence should be viewed in the light most favorable to the defendant. Cf. Marshall v. State, 604 So.2d 799, 806 (Fla.1992) (viewing the mitigation in the light most favorable to the defendant but affirming the override in light of four statutory aggravating circumstances). The trial court must then consider whether the mitigation evidence could serve as a reasonable basis for a life recommendation. See Keen, 775 So.2d at 284 n. 19 (applying this analysis to mitigation evidence regarding disparate treatment of an accomplice).
In this case, there can be no dispute that the jury found the aggravators  the aggravators flow from the fact that the jury convicted Weaver of the charged crimes and that he murdered a law enforcement officer. The judge found one statutory mitigator ("no significant history of prior criminal activity") and three nonstatutory mitigators ("good employment record," "cooperation with police" and "adaptation to a life of incarceration/future value to society"). He assigned this mitigation moderate to little weight. For purposes of an override analysis, however, the judge's determinations on the weight attributable to mitigating factors should not be seen as the jury's determinations, nor do they mandate unflinching deference. Cf. Holsworth v. State, 522 So.2d 348, 354 (Fla.1988) (agreeing with the defendant that in overriding the jury's recommendation, the trial judge could not substitute his view of the evidence and the weight to be given it for that of the jury); Parker v. State, 643 So.2d 1032, 1035 (Fla.1994) (rejecting the State's argument that in the context of a Tedder analysis this Court should defer to a trial judge's discretionary decision regarding the weight of mitigation evidence regardless of the jury's recommendation and noting that "[w]hile some persons may disagree with the weight [of the mitigation evidence presented] . . . clearly other reasonable persons would be convinced by it").
In Weaver's case, the trial judge conducted a typical weighing analysis, noting that "despite the existence of the four mitigating factors and the weight assigned to each by this Court, their nature and quality pale when compared to the severity and enormity of the circumstances of this case" and that the jury based its life recommendation on "minor mitigating circumstances." (Emphasis added.) Instead, the trial judge's override analysis should have proceeded from the premise that the jury assigned great weight to the *201 mitigating factors and, if so, whether such weighty mitigation could have justified a life recommendation.
Here, the jury heard testimony from Weaver's family about his caring behavior towards them and how, even from prison, they believe that he could serve a purpose in their lives. The jury also heard testimony about Weaver's work habits and the fact that this was essentially his first violent offense, though not necessarily his first encounter with the legal system. The trial court found that there was "no significant history of prior criminal activity," but assigned that factor little weight.
The jury certainly could have assigned great weight to the mitigating factors. Weaver's criminal record consisted of five misdemeanor offenses between 1979 and 1982. These crimes were not violent and were remote in time to the murder. We find it possible that the jury could have placed great weight on the fact that this was Weaver's first violent offense. This, in combination with the nonstatutory mitigation presented, provide support for the jury's life recommendation.[21]
Based on the foregoing analysis, we conclude that, as a matter of law, the trial court conducted an improper override analysis and that there was a reasonable basis in the record to support the jury's life recommendation.

E. Sufficiency of the Evidence
This Court must review the record of a death penalty case to determine whether the evidence is sufficient to support the murder conviction. See Fla. R.App. P. 9.140(i); Davis v. State, 859 So.2d 465, 480 (Fla.2003). In conducting this review, the Court must view the evidence in the light most favorable to the State to determine whether "a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Bradley v. State, 787 So.2d 732, 738 (Fla.2001); see McCoy v. State, 853 So.2d 396, 408 (Fla.2003).
Weaver waived his Miranda[22] rights and told detectives that he was the person who shot Officer Peney and did a walk-through of the crime scene where he re-enacted for detectives how he shot Officer Peney. The bullet that struck Officer Peney was from a .357. Weaver identified the .357 as his weapon. An expert in wound ballistics and a firearms examiner testified that the bullet wounds suffered by Officer Peney were consistent with a .357 bullet. A DNA specialist testified that the blood found on the .357 bullet matched Officer Peney's DNA. The frequency of finding someone with the exact DNA profile was roughly 1 in 229 million. Officer Myers testified that he saw Weaver turn and fire a shot from his weapon. Various eyewitnesses confirmed his testimony. *202 Therefore, we conclude that competent, substantial evidence supports the verdict.

III. CONCLUSION
For the reasons stated, we affirm Weaver's conviction but remand to the trial court with instructions to enter a sentence of life imprisonment without the possibility of parole.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs in result only as to the conviction and concurs as to the sentence.
NOTES
[1] As a result of this disposition, we do not address the State's cross-appeal and the issue of proportionality is rendered moot.
[2] See Spencer v. State, 615 So.2d 688, 690-91 (Fla.1993) (requiring trial court to conduct separate evidentiary hearing after jury's recommendation to (a) give the defendant, his counsel, and the State an opportunity to be heard; (b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; and (c) allow both sides to comment on or rebut information in any presentence or medical report).
[3] The court rejected the following mitigation as not established by the greater weight of the evidence: (1) contribution to society/charitable, humanitarian deeds; (2) being a good parent; (3) religious devotion; (4) circumstance of the offense; (5) potential for rehabilitation; (6) sorrow over the victim's injury and death; (7) pretrial and trial conduct; and (8) any other mitigating circumstance within the knowledge of the court.
[4] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[5] Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973), followed by Hardwick v. State, 521 So.2d 1071 (Fla.1988).
[6] We reject the following claims without discussion: (1) the trial court's failure to grant a continuance after Weaver discharged court-appointed counsel, Edward Salantrie; (2) the trial court's denial of Weaver's motion to disqualify the trial court; (3) the trial court's denial of Weaver's motion to disqualify the State Attorney; (4) the trial court's decision to exclude alleged evidence of intervening medical negligence; (5) the trial court's decision to allow a jury view of the crime scene; (6) the exclusion of Weaver's statements to the booking officer; (7) the admission of Weaver's confession; (8) the admission of the victim's statements to his brother as dying declarations; (9) the admission of the attempted armed robbery as "inextricably intertwined" with the charged crimes; and (10) the denial of Weaver's request for a new trial.
[7] Other jurisdictions have addressed this issue in cases where courts have replaced an indigent defendant's conflict-free counsel over the objection of the defendant and counsel. See generally Debra T. Landis, Annotation, Power of Court to Change Counsel Appointed for Indigent, Against Objections of Accused and Original Counsel, 3 A.L.R.4th 1227 (1981). While Mr. Moldof did not formally object to the removal, he also did not file a motion to withdraw. Mr. Moldof believed he did not have a say in the matter because the court had told him that Weaver only had a right to competent counsel and not particular court-appointed counsel.
[8] See Harling v. United States, 387 A.2d 1101, 1105 (D.C.1978) (holding that only gross incompetence, physical incapacity of counsel, or contumacious conduct that the court cannot cure by a contempt citation may justify removal of an attorney over defendant's objection, and stating that mere disagreement as to the conduct of the defense is not sufficient to permit removal of appointed attorney); Cannon v. Comm'n on Judicial Qualifications, 14 Cal.3d 678, 122 Cal.Rptr. 778, 537 P.2d 898, 911 (1975) (holding that involuntary removal of attorney is a severe limitation on defendant's right to counsel and may be justified, if at all, only in the most flagrant circumstances of attorney misconduct or incompetence when all other judicial controls have failed); Smith v. Superior Court of Los Angeles County, 68 Cal.2d 547, 68 Cal.Rptr. 1, 440 P.2d 65, 66 (1968) (holding that it was beyond the court's inherent power and statutory authority to discharge court-appointed attorney where the attorney was removed on the judge's subjective opinion that the attorney was "incompetent" because of ignorance of the law to try defendant's case); People v. Johnson, 215 Mich.App. 658, 547 N.W.2d 65, 68 (1996) (holding that the trial court had no authority to remove court-appointed counsel sua sponte because counsel challenged court's discovery order); People v. Durfee, 215 Mich.App. 677, 547 N.W.2d 344, 347 (1996) (holding that trial judge had no authority to remove sua sponte court-appointed counsel whom judge accused of spreading falsehoods about the judge in public); In re Welfare of M.R.S., 400 N.W.2d 147, 152 (Minn.Ct.App.1987) (holding that the trial court abused its discretion in removing juvenile's appointed counsel following counsel's request for writ of prohibition seeking removal of trial judge); Stearnes v. Clinton, 780 S.W.2d 216, 223-24 (Tex.Crim.App.1989) (holding that the trial court lacked inherent power to remove appointed counsel on grounds that he had violated the district attorney's rule about interviewing state witness, which conflicted with counsel's obligation to seek out and review witnesses).
[9] While Koblitz involved retained counsel, the case remains instructive. As mentioned above, the courts' power sua sponte to remove counsel is the same whether counsel is court-appointed or retained.
[10] In Hardwick v. State, 521 So.2d 1071, 1075 (Fla.1988), this Court adopted the procedure announced in Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973), for handling a defendant's complaint that his appointed counsel is incompetent. When this occurs, the trial judge must make a sufficient inquiry of the defendant to determine whether appointed counsel is rendering effective assistance of counsel.
[11] See Faretta v. California, 422 U.S. 806, 836, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (determining that a defendant in a state criminal trial has the constitutional right of self-representation and may waive the right of assistance of counsel, but requiring trial judge to examine the defendant to determine whether the waiver is made knowingly and intelligently before allowing the defendant to proceed without counsel).
[12] While the trial court did not address the possibility of accidental discharge, that does not rise to the level of error. Accidental discharges, while documented on more than one occasion, can be characterized as rare. See, e.g., State v. Wachholtz, 131 Idaho 74, 952 P.2d 396, 398 (Ct.App.1998); Hawkins v. Comparet-Cassani, 251 F.3d 1230, 1239 (9th Cir.2001) (noting at least nine accidental activations nationwide in initial years of stun belt's use). In any event, even where an accidental discharge of a stun belt actually occurs, the issue is whether the accidental discharge has prejudiced the defendant.
[13] Durham noted that "[i]f the [stun belt] were to be triggered accidentally, the result would be an egregious breach of . . . [the defendant's] most fundamental trial rights." 287 F.3d at 1307. However, a fair reading of Durham indicates that the court was most likely concerned with the stun belt's accidental activation while the jury was present.
[14] The court noted that most of the testimony on this mitigator was extremely remote in time.
[15] The court noted that Weaver "abdicated his parental responsibility to [his three year-old son] Nicholas, by quitting his job where he was capable of financially supporting his son, leaving Nicholas in North Carolina, and ceasing to provide the daily care and commitment of love to the child, in order to aimlessly travel."
[16] The record shows that Weaver had some interest in religion but also shows that Weaver was convicted of larceny of a vehicle, speeding, possession of drug paraphernalia, possession of marijuana, DUI, reckless driving, illegal discharge of a firearm, and both breaking and entering and larceny at a hotel. As the court noted, Weaver also conceived a child out of wedlock and abandoned him as a toddler. The court determined that this behavior did not evince a significant attachment to religion.
[17] The court noted that Weaver shot Officer Peney in the chest, which was a serious and extremely life-threatening injury. Furthermore, the court reasoned that the fact that "Officer Peney was fatally shot once with one bullet when the defendant could have unloaded all the bullets in the chamber of this.357 magnum . . . fails to convince this Court of the existence of this mitigating factor."
[18] The court noted that Weaver had previously committed a series of minor offenses, for which he had received light sentences, but did not learn his lesson and was now found guilty of murder.
[19] The court noted that Weaver's apology was for the victim's family having to endure a trial and for the loss of their son and that Weaver never admitted shooting Officer Peney. The court found Weaver's sorrow to be over his own predicament and noted he expressed no remorse during the guilt or penalty phase.
[20] The court attributed Weaver's trial behavior and ability to get along and be respectful in court to the fact that he was given little chance to act out or misbehave. Weaver wore a stun belt and there was extensive security in the courtroom.
[21] We reject Weaver's argument that the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), itself requires reversal of the judge's override. In this case, the jury convicted Weaver not only of first-degree murder of Officer Peney, but also of other contemporaneous violent felonies involving Officer Myers, such as aggravated assault and armed resisting of an officer with violence. As we have previously held many times, even if Ring applied in Florida, the jury's unanimous determination that the defendant committed other violent felonies involving another victim would make the defendant eligible for the death penalty, thus complying with Ring. See, e.g., Henry v. State, 862 So.2d 679, 687 (Fla.2003) (noting that this Court has previously rejected Ring claims "in cases involving the aggravating factor of a previous violent felony conviction"); see also Stein v. State, 632 So.2d 1361, 1366 (Fla.1994) (holding that contemporaneous crimes may qualify as prior violent felonies).
[22] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).