# Supreme Court of Florida

No. SC18-1643
_____

**DANIEL JACOB CRAVEN, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

October 22, 2020

PER CURIAM.

Daniel Jacob Craven, Jr., appeals his conviction for first-degree murder and his sentence of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons below, we affirm Craven's conviction and sentence.

## BACKGROUND

While serving a sentence of life without the possibility of parole for a conviction of first-degree murder with a weapon, Craven stabbed his cellmate, John H. Anderson, to death with a homemade knife that Craven had fashioned from a piece of their cell door. Craven confessed, multiple times, to killing Anderson and was charged with first-degree premeditated murder. During the guilt-phase opening statements at Craven's trial, defense counsel admitted that

Craven had murdered Anderson but argued that Craven was guilty of second-degree murder.

The evidence presented at trial established that upon Craven's arrival at Graceville Correctional Facility in early April 2015, Craven, a white supremacist with a swastika tattoo, was assigned to share a cell with the victim, who was African American. Craven almost immediately requested to be reassigned to a different cell, claiming that he and the victim were not getting along, but ultimately withdrew the request and indicated that he and the victim would work it out.

On June 25, 2015, three days before the victim's murder, Craven called his mother and demanded that she come to visit him. When Craven's mother stated that she might not be able to make the trip, Craven told her, "Then don't plan on it for about five years." During their phone call, Craven's mother advised him to wait to give himself some time "for whatever is on [his] mind," to which Craven responded, "I made up my mind a long time ago." On June 27, 2015, the day before the victim's murder, Craven's mother visited with him for several hours. After Craven's mother left the facility, Craven called her and told her "not to worry" and that "he loves her."

At 10:07 p.m. on June 27, after watching the movie *Selma*, the victim entered the two-person cell that he shared with Craven. Craven entered the cell just after 1 a.m. on the morning of June 28, 2015. A corrections officer conducted

a visual inspection of the cell door at 1:31 a.m. and did not note anything unusual. At 4:44 a.m., Craven left the cell for breakfast and placed a sign on the window, purportedly from the victim, that stated "[s]tomach bug, sleeping, please do not knock or disturb my rest." Craven entered and exited the cell several times throughout the morning of June 28. At 12:25 p.m., Craven told a corrections officer that he had killed his roommate around 2 a.m. that morning.

Corrections officers found Anderson's body in the cell, and he was pronounced dead. Craven subsequently confessed multiple times to stabbing Anderson to death, to cleaning up the cell, and to hiding the murder weapon in a sock and placing it in a shower grate, where law enforcement later recovered it.

The medical examiner testified that Anderson suffered approximately thirty wounds to his head, throat, neck, and upper torso, twelve of which were stab wounds that punctured Anderson's skin and the remainder of which were incision wounds that cut Anderson's skin. Stab wounds to Anderson's windpipe and jugular vein were critical, and the cause of death was a combination of significant blood loss and the inhalation of blood as a result of the stab wounds. The medical examiner further testified that there were no injuries that would have likely rendered Anderson unconscious, that there were defensive wounds on Anderson's palms and wrists, and that Anderson's death was not immediate and may have

taken from minutes to half an hour, during which time Anderson received painful stab and incision wounds while he essentially drowned in his own blood.

During law enforcement's investigation, bloodstains on Craven's socks and boxer shorts and blood recovered from Craven's ear matched Anderson's DNA. Additionally, a partial DNA match to Anderson was found on the murder weapon, and blood recovered from a wall in Craven and Anderson's cell matched Anderson's DNA.

Craven's jury also heard testimony from an inmate who was housed a few cells away from Craven and Anderson's cell. On the morning of Anderson's murder, the inmate testified that, between 1:30 and 2 a.m., he heard "stumbling" and someone saying "get off of me" and "help me" from the vicinity of Craven and Anderson's cell.

In addition, the jury heard statements that Craven had made to law enforcement, in which he admitted stabbing Anderson to death and that the killing was "planned out," plus letters that Craven had written to government officials, in which he confessed to killing Anderson and threatened his "personal brand of justice" unless he was sentenced to death. One of Craven's letters was titled "Full Confession to a Capital Murder from the Killer," and in it Craven described how he carried out his plan to kill Anderson, who Craven said was asleep in his bunk for an hour to an hour and a half before he began his attack:

I, Daniel Craven, stood up and moved my cards as not to get blood on them, and put up my radio for the same reason, started setting up for the plan I had for about two days.  As I started to carry out the assassination on J. Anderson, . . . the thought of another walk-through at 2:00 AM made me hold off.  As the officers did their walk, I did my normal and watched them.  They left the dorm, and I turned my attention to John.  Mindful of how far a scream can flow in an open quiet gym style living condition, I aimed for [his] throat.  I walked over to John, put my hand over his mouth, and before he opened his eyes, I stabbed him in the thr[o]at once.  He instantly started screaming and kicking and clawing, but I am 300 pounds with wrestling and cage experience, and also have been some form of bouncer my whole life, he wasn't going anywhere.  All of my stabs were intentional aims and placed with purpose.  I took my time, none were accidental or in self defense or wild.  I did not count, but I'm sure it was more than ten but less than 20, 13 to 16 best guess, with one exception: I tried to see if I could bury the knife through the skull on the left side top, but he moved and it didn't catch right.

. . . When John finally stopped spitting blood everywhere, I grabbed his face and told him to go to sleep.  His eyes faded.  I shoved him down back on his bed and stripped.  I grabbed all his clothes and my clothes and started cleaning up the blood, not to get away with anything, just to buy time until I could do a proper farewell to my brothers.  With all the bloody clothes, most of them were slung under his bunk, the rest stuffed in his drawer, I took a bath in the sink with his soap.  I then rolled about three and a half grams into two sticks (joints) and smoked and listened [to music], and played [cards] until the doors were open for chow.  Assuming people or officers were coming to see what the noise was earlier, I made my rounds.  No one came.  I grabbed my food and gave it away, locked my door so I could open it, and went back to hanging out. . . .  Then came lunch.  I ate, smoked again, and then tried to go to rec.  I couldn't get on the yard, and so as I was tired and bored, I went and had to tell the officer hey I killed my bunkie.  This was around 2:00 PM same day.

On June 28, 2018, Craven's jury found him guilty of first-degree murder.[1] The penalty-phase proceeding was held the following day. After hearing witness testimony from the prosecutor in Craven's prior murder case, Craven's half-brother, and mental health experts for both Craven and the State, and arguments from the State and Craven, the jury unanimously found that the State had proven the following aggravating factors beyond a reasonable doubt: (1) Craven was previously convicted of a felony and under sentence of imprisonment; (2) Craven was previously convicted of another capital felony or of a felony involving the use of violence to another person; (3) the first-degree murder was especially heinous, atrocious, or cruel (HAC); and (4) the first-degree murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The jury unanimously concluded that the aggravating factors were sufficient to warrant a possible sentence of death and that the aggravating factors outweighed the mitigating circumstances.[2] Ultimately, the jury unanimously concluded that Craven should be sentenced to death.

---

1. Craven was charged with, and his jury was instructed on, first-degree premeditated murder.

2. The penalty phase verdict form includes the jury's finding that one or more individual jurors found that one or more mitigating circumstances was established by the greater weight of the evidence.

After holding a *Spencer*[3] hearing, at which Craven presented additional mitigation, including his medical, school, and Department of Corrections records, the trial court sentenced Craven to death. In so doing, the trial court made its own findings with respect to the aggravation and mitigation. Specifically, the trial court found and assigned the noted weight to the following statutory aggravating factors: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment (some weight); (2) prior violent felony based on Craven's prior conviction for first-degree murder with a weapon, a capital felony (very great weight); (3) the first-degree murder of Anderson was especially heinous, atrocious, or cruel (very great weight); and (4) the first-degree murder of Anderson was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (very great weight). The trial court found these four aggravating factors "sufficient to warrant the death penalty."

Under the catchall statutory mitigating circumstance of any factors in the defendant's background that would mitigate against the imposition of the death penalty, *see* § 921.141(7)(h), Fla. Stat. (2017), the trial court found that the following mitigating circumstances had been established by the greater weight of the evidence and assigned them the noted weight: (1) chaotic and dysfunctional upbringing (significant weight); (2) no evidence of biological father present in

3. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

- 7 -

Craven's life (some weight); (3) Craven is able to maintain meaningful relationships (slight weight); (4) Craven has mental health issues (significant weight); and (5) Craven maintained appropriate courtroom behavior (little weight). The trial court rejected Craven's proposed mitigating circumstance that he had maintained employment prior to his incarceration, finding that Craven failed to establish this mitigating circumstance by the greater weight of the evidence.

The trial court sentenced Craven to death, finding that "the aggravating factors far outweigh the mitigating circumstances." The trial court also compared Craven's case to "other factually similar cases" and concluded that "the death penalty is not disproportionately applied to [Craven]."

## ANALYSIS

Craven now appeals his conviction and sentence of death, raising the following claims: (1) the trial court erred in denying his request for self-representation; (2) the trial court erred in denying his peremptory challenge to juror Ford; (3) the trial court fundamentally erred by not instructing the penalty phase jury to determine beyond a reasonable doubt whether the aggravating factors were sufficient and outweighed the mitigating circumstances; (4) the trial court erred in admitting statements made by Craven's prior victim in support of the prior violent felony aggravator; (5) the trial court erred in finding the HAC aggravator; (6) the trial court erred in finding the CCP aggravator; and (7) Craven's death sentence is

disproportionate. In addition, we review whether the evidence is sufficient to support Craven's conviction for first-degree murder.

### (1) Self-Representation

Craven first argues that the trial court erred in denying his request for self-representation. We review the trial court's ruling for abuse of discretion, *see Damas v. State*, 260 So. 3d 200, 212 (Fla. 2018), and find none.

As we have explained, "[a] criminal defendant has the right to self-representation, *Faretta* [*v. California*, 422 U.S. 806, 819 (1975)], and a trial court 'shall not deny a defendant's *unequivocal* request to represent himself or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel.' *Weaver v. State*, 894 So. 2d 178, 192 (Fla. 2004) (quoting Fla. R. Crim. P. 3.111(d)(3))." *Damas*, 260 So. 3d at 212 (emphasis added).

In Craven's case, the record shows that although Craven initially requested to represent himself, he had a change of heart before his trial began. Specifically, toward the end of the second of two *Faretta* inquiries that the trial court conducted, in response to the trial court's question of whether Craven would be "all right with your attorneys remaining in place so long as they abided by your decisions as to the presentation of mitigating evidence," Craven answered, "Yes, sir." In light of Craven's change of heart, we conclude that the trial court did not abuse its

discretion in denying Craven's request for self-representation as equivocal. *See Brown v. State*, 45 So. 3d 110, 115 (Fla. 1st DCA 2010) (recognizing that, absent deliberate manipulation of the proceedings, "a defendant may change his mind about self-representation at the beginning of any crucial stage of a criminal prosecution"); *see also Hardwick v. State*, 521 So. 2d 1071, 1074 (Fla. 1988) (recognizing that "vacillation on the question of self-representation has been held a sufficient grounds for denying the request"), *superseded on other grounds as stated in Hooks v. State*, 286 So. 3d 163, 169 (Fla. 2019); *cf. Weaver*, 894 So. 2d at 193 ("A defendant who *persists* in discharging competent counsel after being informed that he is not entitled to substitute counsel is presumed to be unequivocally exercising his right of self-representation.") (emphasis added).

### (2) Peremptory Challenge

Craven next argues that the trial court erred in denying his peremptory challenge to juror Ford, an African American, on the ground that Craven failed to provide a race-neutral reason for striking Ford.[4] We review the trial court's ruling for abuse of discretion. *See Truehill v. State*, 211 So. 3d 930, 942 (Fla. 2017).

---

4. Although Craven also argues that the trial court confused his peremptory challenge to juror Ford with a for-cause challenge, it is clear from the record that the trial court knew a peremptory challenge was at issue and found that Craven's proffered reason for challenging juror Ford was pretextual.

"Under Florida law, a party's use of peremptory challenges is limited only by the rule that the challenges may not be used to exclude members of a 'distinctive group,' " such as race. *San Martin v. State*, 705 So. 2d 1337, 1343 (Fla. 1997). The following three-step test applies in determining whether a proposed peremptory challenge is race-neutral:

> A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
> At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step 3 is not on the reasonableness of the explanation but rather its genuineness. Throughout this process, the burden of persuasion never leaves the opponent of the strike to prove purposeful racial discrimination.

*Melbourne v. State*, 679 So. 2d 759, 764 (Fla. 1996) (footnotes omitted).

Craven's case involves step 3 of *Melbourne*. As we have explained with respect to that step,

> "[t]here are no specific words which the court must state to satisfy step three of the *Melbourne* analysis." *Murray v. State*, 3 So. 3d 1108, 1119 (Fla. 2009) (quoting *Simmons v. State*, 940 So. 2d 580, 582 (Fla. 1st DCA 2006)). "Rather, the most important consideration is that the trial judge actually 'believes that given all the circumstances surrounding the strike, the explanation is not a pretext.' " *Id.* at 1120 (quoting *Rodriguez v. State*, 753 So. 2d 29, 40 (Fla. 2000)).

*Guzman v. State*, 238 So. 3d 146, 155 (Fla. 2018). Moreover, "[t]he trial court's decision in ruling on the genuineness of the race-neutral basis for a peremptory challenge should be affirmed unless clearly erroneous." *Dorsey v. State*, 868 So. 2d 1192, 1200 (Fla. 2003).

To analyze whether the trial court erred in finding that Craven's proffered reason for the strike was a pretext, we review the alleged race-neutral reasons given and the relevant circumstances in which they were made. *Nowell v. State*, 998 So. 2d 597, 604 (Fla. 2008). Circumstances relevant to our analysis include, but are not limited to, the following: "the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment." *Melbourne*, 679 So. 2d at 764 n.8.

In this case, Craven, who is white, had clear racial motivations for murdering Anderson, who was black. The record indicates that only six members of the approximately seventy-five-member venire were black. Only one black juror served on the jury without objection by Craven. By the time Craven proposed a peremptory strike against juror Ford, Craven had successfully exercised a peremptory strike as to one other black prospective juror (Hunter), and he had

also proposed a peremptory strike against a second black prospective juror (Holden).[5]

Craven's alleged race-neutral reason for striking juror Ford was that, although rehabilitated, juror Ford "was one of those whose original impulse was if [the murder] was found to be premeditated, then [the sentence] would be the death penalty." Although Craven argues, and the dissent concludes, that the trial court failed to undertake the required genuineness inquiry of defense counsel's alleged facially race-neutral reason for the strike, we disagree. The record demonstrates that the trial court was clearly taken aback by Craven's proffered reason because Craven had not previously argued that juror Ford was predisposed to the death penalty. In contrast to defense counsel's treatment of juror Ford, the record shows that Craven had raised unsuccessful for-cause challenges, based on alleged predisposition to death, to non-black prospective jurors whose voir dire responses regarding their views of the death penalty were similar to juror Ford's responses.[6]

---

5. After the trial court ruled that Craven's proffered reasons for his proposed strike of prospective juror Holden were not race-neutral, the State withdrew its objection to Craven's peremptory strike as to Holden. However, the withdrawal occurred after the challenged ruling with respect to juror Ford.

6. Specifically, Craven raised for-cause challenges to at least two non-black prospective jurors (Forehand and J. Sims), arguing that they were predisposed to death, even though they had been rehabilitated. The trial court denied the for-cause challenges, and Craven subsequently successfully exercised a peremptory challenge with respect to both prospective jurors.

Accordingly, when Craven proffered predisposition to death as the race-neutral reason for the proposed peremptory strike of juror Ford, the trial court looked to its notes, which did not reflect that juror Ford "would automatically sway to death or that he felt strongly in favor of death or that he didn't think he could be fair."

The trial court's conclusion is not without record support. Although juror Ford's initial response to the question of how he "feel[s]" about the death penalty does lend some support to Craven's argument that, at least initially, juror Ford believed the death penalty to be an appropriate punishment for first-degree premeditated murder, that is not tantamount to being predisposed to the death penalty.[7] Instead, the record shows that juror Ford never firmly equated the death penalty with first-degree premeditated murder and that he clarified any confusion created by his initial answer through responses to follow-up questions, including by stating that he would not automatically vote for the death penalty if Craven was convicted of first-degree premeditated murder and that he would listen to all of the evidence and consider all of the proposed mitigation.

---

7. When the State questioned juror Ford, who stated that he had never thought about the death penalty before voir dire, as to how he "feel[s]" about the death penalty, juror Ford initially responded, "Well, if it's deserved, for instance, if he had premeditated, just did it, yes, the death penalty. But if he was under some kind of influence, alcohol, drugs, anything like that and did it, maybe life, that's how I feel."

Moreover, like the trial court, the State represented that its notes did not reflect that juror Ford was predisposed to the death penalty. The State also argued that defense counsel had confused juror Ford's voir dire responses with the responses of another prospective juror (Glisson) who had been questioned at the same time as juror Ford and stricken for cause after stating that she would automatically vote for the death penalty if Craven was convicted of first-degree premeditated murder. Although the burden to prove purposeful racial discrimination remained with the State as the opponent of the strike, defense counsel did not dispute the State's argument that she had confused the two prospective jurors' responses or otherwise attempt make a record on this issue, and the State accurately described prospective juror Glisson's responses. Nor did defense counsel argue below that the trial court had failed to comply with step 3 of *Melbourne* in denying the peremptory strike to Juror Ford. *Cf. State v. Johnson*, 295 So. 3d 710, 714-16 (Fla. May 21, 2020).[8]

8. This case was briefed prior to our decision in *Johnson*, where we held in the context of a *Melbourne* claim that the objecting party, not the trial court, has the obligation to preserve the record. 295 So. 3d at 715. Neither party raised the issue of whether defense counsel preserved the specific challenge to the trial court's alleged noncompliance with *Melbourne* that Craven now raises—i.e., whether the trial court failed to conduct a genuineness inquiry—and we do not decide that issue.

- 15 -

Nevertheless, the dissent would reverse based on its conclusion that the trial court never reached the genuineness of Craven's proffered facially race-neutral reason. In support, the dissent cites our decision in *Hayes v. State*, 94 So. 3d 452, 463 (Fla. 2012), for the proposition that we cannot assume that the trial court conducted the genuineness inquiry required by step 3 of *Melbourne* "where the record is completely devoid of any indication that the trial court considered circumstances relevant to whether a strike was exercised for a discriminatory purpose." Dissenting op. at 34 (quoting *Hayes*, 94 So. 3d at 463). However, in *Johnson*, where we disapproved of dicta in *Hayes*, we explained that "there will be some cases in which the trial judge does not believe the proffered reason to be genuine despite the contrary presumption, in which case the correct ruling under *Melbourne* would be to sustain the opponent's objection and disallow the strike." 295 So. 3d at 715. Although *Johnson* certainly did not relieve trial courts of the obligation to comply with all three steps of *Melbourne*, "there are no magic words that must be uttered by the trial judge in order to fulfill the *Melbourne* requirements." *Washington v. State*, 773 So. 2d 1202, 1204 n.2 (Fla. 3d DCA 2000). In Craven's case, even assuming that *Hayes* remains good law on the point cited by the dissent, we disagree with the dissent's assessment that the record is "devoid" of any indication that the trial court conducted *Melbourne*'s step-3 genuineness inquiry. Rather, it is clear that the trial court did not believe Craven's

proffered race-neutral reason was genuine, in part because Craven had failed to raise the allegation of juror Ford's predisposition to death in the same manner that Craven had raised that allegation with respect to non-black prospective jurors. Indeed, as we have explained, the record indisputably shows that Craven did, in fact, treat juror Ford differently.

Given the totality of the circumstances, and mindful of the deference owed to the trial court's resolution of the genuineness inquiry, we find no abuse of discretion in the trial court's finding that Craven's proffered reason for striking juror Ford was a pretext. *See Guzman*, 238 So. 3d at 155. Accordingly, we affirm the trial court's denial of Craven's peremptory challenge to juror Ford.

### (3) Penalty Phase Jury Instructions

Craven next argues that the trial court fundamentally erred in instructing his penalty phase jury in accordance with the standard jury instructions, which do not require the jury to find beyond a reasonable doubt that the aggravating factors are sufficient and outweigh the mitigating circumstances. *See* Fla. Std. Jury Instr. (Crim.) 7.11. We have repeatedly rejected this argument. *See, e.g.*, *Newberry v. State*, 288 So. 3d 1040, 1047 (Fla. 2019) (rejecting fundamental-error claim because the sufficiency and weighing determinations "are not subject to the beyond a reasonable doubt standard of proof") (citing *Rogers v. State*, 285 So. 3d 872, 886 (Fla. 2019)); *see also McKinney v. Arizona*, 140 S. Ct. 702, 707 (2020) ("Under

- 17 -

*Ring* [*v. Arizona*, 536 U.S. 584 (2002),] and *Hurst* [*v. Florida*, 136 S. Ct. 616 (2016)], a jury must find the aggravating circumstance that makes the defendant death eligible. But importantly, in a capital sentencing proceeding, just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate decision within the relevant sentencing range."); *State v. Poole*, 297 So. 3d 487, 507 (Fla. Jan. 2020) ("reced[ing] from *Hurst v. State* [202 So. 3d 40 (Fla. 2016)] except to the extent it requires a jury unanimously to find the existence of a statutory aggravating circumstance beyond a reasonable doubt"). Accordingly, because the trial court did not err in instructing the penalty phase jury, let alone fundamentally so, Craven is not entitled to relief on this claim.

### (4) Prior Violent Felony

Craven next argues that the trial court erred by admitting statements made by Craven's prior victim in support of the prior violent felony aggravator. Specifically, over Craven's objections, the trial court allowed the prosecutor from Craven's prior first-degree murder case to testify that, during Craven's murder of his prior victim, the prior victim begged Craven to let him go, told Craven that he would leave, and asked Craven to remember that the victim had two children. Craven argued that the prior victim's statements were irrelevant and that their probative value was substantially outweighed by the danger of unfair prejudice.

- 18 -

We review the trial court's admission of this evidence over Craven's objections for abuse of discretion, *see Franklin v. State*, 965 So. 2d 79, 96 (Fla. 2007), and find none.

As we have explained, "it is appropriate in the penalty phase of a capital trial to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of the conviction." *Rhodes v. State*, 547 So. 2d 1201, 1204 (Fla. 1989). Such testimony "assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence." *Id.*; *see also* § 921.141(1), Fla. Stat. (2017) (providing that during the penalty phase proceeding "evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant . . . regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements"). "In determining whether a trial court has abused its discretion in admitting evidence of prior violent felony convictions, this Court looks at the tenor of the witness['s] testimony and whether this testimony became a central feature of the penalty phase." *Franklin*, 965 So. 2d at 96.

Below, in three lines of her six-page testimony, the prosecutor in Craven's prior first-degree murder case testified to statements made by Craven's prior victim

during the murder. She did so, without editorializing, as part of a nineteen-line response to the State's request to describe the circumstances of the prior murder. During the penalty phase closing argument, the State did not repeat the prior victim's statements in arguing that the prior violent felony aggravator had been proven beyond a reasonable doubt and was entitled to great weight. Rather, the State argued that jury had heard the prior prosecutor's testimony and "the details, the nature and circumstances of [the] prior capital felony and how violent it was." On these facts, the prior victim's statements did not impermissibly become a central feature of the penalty phase. *See Cox v. State*, 819 So. 2d 705, 716-17 & n.12 (Fla. 2002) (concluding there was "no basis to reverse the ruling of the court below admitting testimonial evidence of the appellant's prior violent felonies" where the "evidence was not emphasized to the level of rendering the prior offenses a central feature of the penalty phase" and the record instead showed that each witness "simply relat[ed] [the defendant's] crimes against him or her" without "emotional displays or breakdowns").

Accordingly, because the trial court did not abuse its discretion in admitting the challenged testimony, Craven is not entitled to relief on this claim.

### (5) HAC

Craven next claims that the trial court erred in finding the HAC aggravator. When reviewing claims alleging that the trial court erred in finding an aggravating

factor, we do not reweigh the evidence. *McGirth v. State*, 48 So. 3d 777, 792 (Fla. 2010). "Rather, this Court's role on appeal is to review the record to determine whether the trial court applied the correct rule of law for each aggravator and, if so, whether competent, substantial evidence exists to support its findings." *Id.* In reviewing the record for competent, substantial evidence, which "is tantamount to legally sufficient evidence," *State v. Coney*, 845 So. 2d 120, 133 (Fla. 2003), we "view the record in the light most favorable to the prevailing theory," *Wuornos v. State*, 644 So. 2d 1012, 1019 (Fla. 1994).

> Regarding the HAC aggravator, we have explained
>
> that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*State v. Dixon*, 283 So. 2d 1, 9 (Fla. 1973), *superseded in part on other grounds by ch.* 74-383, § 14, *Laws of Fla.*, *as stated in State v. Dene*, 533 So. 2d 265, 267 (Fla. 1988).

Craven first argues that the trial court applied an incorrect rule of law because it supported its finding of the HAC aggravator in part with the conclusion that Craven intended to inflict a high degree of pain upon the victim and was indifferent to the victim's suffering. Craven argues that, rather than looking to his

intent, the trial court was required to limit its analysis to the means and manner used to inflict death and the immediate circumstances surrounding the death from the victim's perspective. We have explained that "[t]he HAC aggravator is proper 'only in torturous murders—those that evince extreme and outrageous depravity as exemplified by either the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another.' " *Orme v. State*, 25 So. 3d 536, 551 (Fla. 2009) (quoting *Guzman v. State*, 721 So. 2d 1155, 1159 (Fla. 1998)). We have recognized that "the HAC aggravator does not necessarily focus on the intent and motivation of the defendant, but instead on the 'means and manner in which death is inflicted and the immediate circumstances surrounding the death.' " *Orme*, 25 So. 3d at 551 (quoting *Brown v. State*, 721 So. 2d 274, 277 (Fla. 1998)). And we have similarly explained that "if a victim is killed in a torturous manner, a defendant need not have the intent or desire to inflict torture, because the very torturous manner of the victim's death is evidence of a defendant's indifference." *Barnhill v. State*, 834 So. 2d 836, 850 (Fla. 2002). However, our precedent does not preclude the trial court from finding that the defendant actually intended to inflict a high degree of pain or was indifferent to the victim's suffering, where competent, substantial evidence supports it.

In Craven's case, the record supports the trial court's findings regarding Craven's intent and the trial court's application of the HAC aggravator. According

to the medical examiner, Craven stabbed the victim approximately thirty times in the head, throat, neck, and upper torso, twelve of which penetrated deep into the victim's skin and the rest of which were incisive wounds, and all of which would have been painful to the victim. We have, on numerous occasions, upheld HAC where the victim was repeatedly stabbed. *See, e.g.*, *Barwick v. State*, 660 So. 2d 685, 696 (Fla. 1995) (stabbed thirty-seven times), *receded from on other grounds by Topps v. State*, 865 So. 2d 1253, 1258 n.6 (Fla. 2004); *Finney v. State*, 660 So. 2d 674, 685 (Fla. 1995) (stabbed thirteen times); *Campbell v. State*, 571 So. 2d 415, 418 (Fla. 1990) (stabbed twenty-three times), *receded from on other grounds by Trease v. State*, 768 So. 2d 1050, 1055 (Fla. 2000).

Nevertheless, Craven argues that the evidence is insufficient to establish the victim's death was unnecessarily torturous because he intended to speed the victim's death by first stabbing him in the windpipe. The record, however, shows "that the victim was conscious and aware of impending death," as required to establish the HAC aggravator. *Douglas v. State*, 878 So. 2d 1246, 1261 (Fla. 2004). Craven confessed that he snuck up on the victim with a homemade knife while the victim was sleeping, that he intentionally aimed for the victim's throat to prevent him from screaming, and that the victim "instantly started screaming and kicking and clawing" and was "spitting blood everywhere." Craven further confessed, "All of my stabs were intentional aims and placed with purpose. I took

- 23 -

my time, none were accidental . . . ."  After he had finished stabbing the victim, Craven told law enforcement he grabbed the victim's face and watched the victim's eyes fade as he told him to go to sleep.

Consistent with Craven's confession, the medical examiner testified that the victim was not likely rendered unconscious by any of the wounds and that he had defensive wounds on his palms and wrists.  Thus, even if the victim was asleep during the first stab, he was conscious and aware of his impending death during at least part of the murder, which the medical examiner testified was not instantaneous and could have taken from minutes to half an hour.  We have upheld the application of the HAC aggravator under similar facts.  *See Hall v. State*, 107 So. 3d 262, 276 (Fla. 2012) ("We have repeatedly upheld the HAC aggravating circumstance in cases where the victim has been stabbed numerous times . . . and has remained conscious for at least part of the attack. . . .  Further, we have held that when a victim sustains defense-type wounds during the attack, it indicates that the victim did not die instantaneously and in such a circumstance HAC was proper."); *Nibert v. State*, 508 So. 2d 1, 4 (Fla. 1987) (finding HAC where the evidence established that the victim was stabbed seventeen times, had defensive wounds, and remained conscious throughout the stabbing).  Competent, substantial evidence supports the trial court's finding of the HAC aggravator in Craven's case.

## (6) CCP

Craven next argues that the trial court erred in finding the CCP aggravator, which applies where the evidence establishes

> (1) "the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)"; (2) "the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated)"; (3) "the defendant exhibited heightened premeditation (premeditated)"; (4) "the defendant had no pretense of moral or legal justification."

*Rogers*, 285 So. 3d at 887 (quoting *Williams v. State*, 37 So. 3d 187, 195 (Fla. 2010)). Craven concedes that the trial court applied the correct rule of law. However, he argues that the evidence is insufficient to support application of the CCP aggravator. We disagree.

Although Craven has claimed that he possessed the murder weapon, a homemade shank, for protection, the record establishes that Craven planned to kill Anderson with that weapon days before he carried out the murder. Prior to carrying out his plan, Craven even took the time to arrange a visit with his mother because he knew he would not be permitted to visit with her after killing Anderson. Although Craven has claimed that he was agitated because Anderson spoke of having sex with a fourteen-year-old girl, there was no evidence that Anderson's criminal history included sexual offenses, and for over a month before Craven made this claim, he expressed other reasons for killing Anderson, including his desires to start a race riot and to get on death row. Although Craven has also

claimed that Anderson made racial slurs against whites a few hours before the murder after watching the movie *Selma* and that Anderson had defensive wounds on his hands, indicating provocation and resistance by the victim, the record shows that Anderson was asleep and defenseless when Craven began his attack and that Craven purposely waited to carry out his attack on Anderson until after the corrections officer had checked their cell so that his planned "assassination" of Anderson would not be interrupted. Competent, substantial evidence supports the CCP finding.

### (7) Proportionality

Craven next argues that his sentence of death is disproportionate in comparison to other cases in which the sentence of death has been imposed. Our precedent requires us to conduct a comparative proportionality review of every death sentence for the purpose of "ensur[ing] uniformity of sentencing in death penalty proceedings." *Rogers*, 285 So. 3d at 891, and that the death penalty is "reserved for only the most aggravated and least mitigated of first-degree murders." *id.* at 892 (quoting *Urbin v. State*, 714 So. 2d 411, 416 (Fla. 1998)); *see also* Fla. R. App. P. 9.142(a)(5) (providing that the Court shall review proportionality on direct appeal whether or not the issue is presented by the parties). Our review does not simply involve comparing the number of aggravating and mitigating circumstances; rather, we consider the totality of the

circumstances and compare each case with other cases, accepting the weight

assigned by the trial court to the aggravating and mitigating circumstances. *See*

*Newberry*, 288 So. 3d at 1049.[9]

In Craven's case, the trial court found four aggravators to which it assigned

the noted weight: (1) the capital felony was committed by a person previously

convicted of a felony and under sentence of imprisonment (some weight); (2) prior

violent felony based on Craven's prior conviction for first-degree murder with a

weapon, a capital felony (very great weight); (3) the first-degree murder of

Anderson was especially heinous, atrocious, or cruel (very great weight); and (4)

the first-degree murder of Anderson was committed in a cold, calculated, and

premeditated manner without any pretense of moral or legal justification (very

great weight). The trial court found that the following "catchall" statutory

mitigating circumstances were established by the greater weight of the evidence

and assigned them the noted weight: (1) chaotic and dysfunctional upbringing

(significant weight); (2) no evidence of biological father present in Craven's life

(some weight); (3) Craven is able to maintain meaningful relationships (slight

---

9. Although the State questions in its answer brief whether our comparative proportionality review violates the conformity clause of article I, section 17 of the Florida Constitution, the State does not ask us to reconsider our precedent. Moreover, the State effectively conceded the issue at oral argument by arguing that Craven's sentence is proportionate, without referencing any potential constitutional problem with conducting a comparative proportionality review of his death sentence.

weight); (4) Craven has mental health issues (significant weight); and (5) Craven maintained appropriate courtroom behavior (little weight).

"We have held that both the HAC and CCP aggravators are 'two of the most serious aggravators set out in the statutory sentencing scheme.' " *Buzia v. State*, 926 So. 2d 1203, 1216 (Fla. 2006) (quoting *Larkins v. State*, 739 So. 2d 90, 95 (Fla. 1999)). "Similarly, the prior violent felony aggravator is considered one of the weightiest aggravators." *Silvia v. State*, 60 So. 3d 959, 974 (Fla. 2011). Craven's case involves all three.

We have upheld death sentences for first-degree murders that were both less aggravated and more mitigated than Craven's murder of Anderson. *See, e.g.*, *Brant v. State*, 21 So. 3d 1276, 1283, 1287-88 (Fla. 2009) (death sentence proportionate where defendant sexually battered and strangled the victim in her home and the trial court found the statutory aggravators of HAC and during the course of a sexual battery; three statutory mitigating circumstances, including that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and numerous nonstatutory mitigating circumstances, including the defendant's borderline verbal intelligence, the defendant's family history of mental illness, that the defendant had diminished impulse control and exhibited periods of psychosis due to methamphetamine abuse, that the defendant recognized his drug dependence

problem and sought help for his drug problem, that the defendant used methamphetamine before, during, and after the murder, and the defendant's diagnosis of chemical dependence and sexual obsessive disorder and symptoms of attention deficit disorder).

We have upheld the death penalty in similar prison murders. *See, e.g.*, *Robertson v. State*, 187 So. 3d 1207, 1209, 1211, 1218 (Fla. 2016) (death sentence proportionate where defendant strangled his cellmate with a garrote and the trial court found the aggravators of prior violent felony, under sentence of imprisonment for a previous felony conviction, HAC, and CCP; the statutory mitigating circumstance of extreme mental or emotional disturbance; and several nonstatutory mitigating circumstances, including a family history of alcoholism and substance abuse disorders, the defendant's own drug use and long criminal history, and childhood exposure to poverty, substance abuse, and domestic violence).

We have also found death sentences proportionate in cases where the prior violent felony aggravator was based on the defendant's commission of a prior murder. *See, e.g.*, *Lawrence v. State*, 846 So. 2d 440, 442-45, 445 n.8, 455 (Fla. 2003) (death sentence proportionate in planned execution-style murder where the trial court found the aggravators of CCP and prior violent felony, which was based in part on a prior murder; five statutory mitigating circumstances, including both

statutory mental health mitigating circumstances; and several nonstatutory mitigating circumstances, including the defendant's model behavior).

Accordingly, we hold that Craven's death sentence is proportionate.

## (8) Sufficiency

Finally, even though Craven does not argue that the evidence is insufficient to support his conviction for first-degree murder, "this Court independently reviews the record in death penalty cases to determine whether competent, substantial evidence supports the conviction." *Rogers*, 285 So. 3d at 891 (citing Fla. R. App. P. 9.142(a)(5)). In conducting this review, we view "the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Rodgers v. State*, 948 So. 2d 655, 674 (Fla. 2006).

The State charged Craven with the first-degree premeditated murder of Anderson, which required the State to prove: (1) Anderson is dead; (2) Anderson's death was caused by the criminal act of Craven; and (3) Anderson's death was a result of Craven's premeditated killing. *See* Fla. Std. Jury Instr. (Crim.) 7.2. At trial, it was undisputed that Anderson is deceased, and Craven admitted to killing Anderson in opening statements. The evidence presented at trial established that Craven was the only person who had access to Anderson during the time he was murdered. Blood found on Craven's person, effects, and prison cell matched

Anderson's DNA profile, and corrections officers recovered the murder weapon from the location where Craven told them he had hidden it. Craven also confessed, multiple times, to planning and following through on his plan to assassinate Anderson, both verbally and in writing, including identifying his desires to start a race riot and to get on death row as motivations for the murder. The evidence showed that Craven and Anderson had a turbulent relationship, and Craven arranged a hasty visit with his mother the day prior to the murder, warning her that if she did not visit him immediately, she would not be able to see him again for several years. After the murder, Craven confessed that the killing was "planned out," and before the murder, when his mother asked him to wait to give himself some time "for whatever is on [his] mind," Craven responded that he had "made up [his] mind a long time ago." Competent, substantial evidence supports Craven's conviction for first-degree murder under the theory that the killing was premeditated.

## CONCLUSION

For the foregoing reasons, we affirm Craven's conviction and sentence of death.

It is so ordered.

POLSTON, LABARGA, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.
CANADY, C.J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, C.J., dissenting.

Because I would conclude that the trial court erred in sustaining the State's objection to Craven's exercise of a peremptory strike on prospective juror Ford, I would reverse Craven's conviction and remand for a new trial. I therefore dissent.

As an initial matter, the majority has misinterpreted the trial court's ruling. The majority "analyze[s] whether the trial court erred in finding that Craven's proffered reason for the strike was a pretext," majority op. at 12, and concludes that the trial court did not abuse its discretion in finding that the proffered reason for the strike was a pretext. In so doing, the majority has analyzed and upheld a ruling that never occurred; the trial court never made a finding that Craven's reason for the strike was a pretext. Instead, after Craven provided his race-neutral explanation for attempting to strike Ford, the trial court stated, "I'm going to deny that as a race neutral basis, I don't find that that is," and disallowed the strike.

Under *Melbourne*, once the proponent of a challenged peremptory strike asserts an explanation for the strike, the trial court is first tasked with determining whether the explanation is facially race-neutral. *Melbourne v. State*, 679 So. 2d 759, 764 (Fla. 1996). Only after the court determines that the strike is facially race-neutral, and the opponent of the strike contests the genuineness of the proffered explanation, *State v. Johnson*, 295 So. 3d 710, 714 (Fla. 2020), does the

- 32 -

court proceed to conduct a genuineness analysis to determine whether it believes the explanation is a pretext for excluding a member of a distinct racial group from the jury. *Melbourne*, 679 So. 2d at 764.

Here, the State never contested the genuineness of Craven's explanation. And the trial court—because its inquiry ended upon making the finding that the explanation was not facially race-neutral—never reached the question of whether the explanation was a pretext, never conducted a genuineness analysis of the explanation, and never ruled that Craven's proffered reason for the strike was a pretext. *See id.* at 764 n.7 ("If the explanation is not facially race-neutral, the inquiry is over; the strike will be denied."). The trial court denied the strike solely on the basis that it was not race neutral. It is crystal clear from the words used by the trial court—"I'm going to deny that as a race-neutral basis"—that the court was assessing the facial neutrality of Craven's explanation rather than its genuineness. *See Hayes v. State*, 93 So. 3d 427, 429 (Fla. 1st DCA 2012) ("[A]lthough a trial court is not required to follow a specific script or incant particular words in conducting the *Melbourne* analysis, we have to assume that the trial court in this case said what it meant and meant what it said in ruling that the reason for the strike was not gender-neutral." (citation omitted)).

This conclusion is further supported by the fact that in denying Craven's strike, the trial court did not consider any of the relevant circumstances

- 33 -

surrounding the strike that should be considered by a court conducting a genuineness inquiry.[10] As this Court has stated, "where the record is completely devoid of any indication that the trial court considered circumstances relevant to whether a strike was exercised for a discriminatory purpose, the reviewing court, which is confined to the cold record before it, cannot assume that a genuineness inquiry was actually conducted in order to defer to the trial court." *Hayes v. State*, 94 So. 3d 452, 463 (Fla. 2012), *disapproved of on other grounds by Johnson*, 295 So. 3d at 716. Thus, the majority has completely missed the mark by reviewing a genuineness inquiry that did not occur and upholding a phantom finding that the strike was a pretext for discrimination.

The trial court's finding that Craven's explanation for the strike was not race-neutral was clearly erroneous. Of assessing the facial validity of a party's explanation for a peremptory strike, the Supreme Court has said that this "step of this process does not demand an explanation that is persuasive, or even plausible" and "[u]nless a discriminatory intent is inherent in the [party]'s explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)). This Court

---

10. Under *Melbourne*, those relevant circumstances "may include—but are not limited to—the following: the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment." *Melbourne*, 679 So. 2d at 764 n.8.

has held that peremptory challenges may be used "to peremptorily strike 'persons thought to be inclined against [the proponent's] interests.' " *San Martin v. State*, 717 So. 2d 462, 467-68 (Fla. 1998) (quoting *San Martin v. State*, 705 So. 2d 1337, 1343 (Fla. 1997)). Indeed, "[p]eremptory challenges . . . can be used to excuse a [prospective] juror for any reason, so long as that reason does not serve as a pretext for discrimination." *Busby v. State*, 894 So. 2d 88, 99 (Fla. 2004).

When initially asked how he felt about the death penalty, prospective juror Ford responded, "Well, if it's deserved, for instance, if he had premeditated, just did it, yes, the death penalty. But if he was under some kind of influence, alcohol, drugs, anything like that, and did it, maybe life, that's how I feel." Based on that response, Craven's asserted basis for the strike was that Ford's "original impulse was [to say] if it [the murder] was found to be premeditated, then [his verdict] would be the death penalty." Regardless of what the prosecutor or the trial judge may have thought, the factual ground for this asserted basis concerning the juror's original impulse is unequivocally supported by the record. Craven explained that he thought Ford was inclined against his interests because of that original impulse. Because there was no discriminatory intent inherent in that explanation, it was facially race-neutral. Craven having clearly and specifically presented his racially neutral explanation—an explanation undeniably based on facts established by the record—nothing in our law required that he engage in argument with the trial court

concerning the matter. And the trial court's misapprehension of the relevant facts is by no means a basis for sustaining the trial court's decision. Thus, the trial court's conclusion that Craven failed to provide a race-neutral explanation for the strike was erroneous.

Because our precedents treat an erroneous determination that a proffered explanation for a peremptory strike is not facially race-neutral as per se reversible error, Craven is entitled to relief. *See Hayes*, 94 So. 3d at 461 ("Compliance with each step [of the *Melbourne* procedure] is not discretionary, and the proper remedy when the trial court fails to abide by its duty under the *Melbourne* procedure is to reverse and remand for a new trial."). I would therefore reverse Craven's conviction and sentence and remand for a new trial.

An Appeal from the Circuit Court in and for Jackson County,
    Christopher N. Patterson, Judge - Case No. 322016CF000451CFAXMX

Andy Thomas, Public Defender, and A. Victoria Wiggins, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

    for Appellant

Ashley Moody, Attorney General, and Michael T. Kennett, Assistant Attorney General, Tallahassee, Florida,

    for Appellee